This is Gomez v. Credit Suisse. Thank you. That's correct, Your Honor. And thank you. Good morning and may it please the court. My name is Daniel Centner and I'm here on behalf of the plaintiff appellant in this case, Miss Adelina Gomez. Miss Gomez appeals the dismissal of her putative class action complaint for failure to state a claim under Rule 12 v. 6. That complaint alleged securities fraud claims arising out of the implosion of a Credit Suisse exchange traded note or ETN product that was formerly listed under the name of DGAS, D-G-A-Z. Specifically, this case concerns a press release that Credit Suisse issued on June 22nd of 2020 announcing, one, that it was delisting DGAS and several other ETNs effective July 10th of that year. And, two, that effective immediately Credit Suisse was suspending issuance of all of those same ETNs. We're here today because of what the press release did not disclose, however, which is that immediately after that press release was issued. We're looking at the press release and the prospectus. Pardon me, sir? We're looking at the press release and the prospectus, which was also public information, right? That's correct. There was a link included in the press release to the prospectus that contained similar warnings. All of that information. Correct. But as- Did it caution about the development of a price premium? Did it specifically indicate that in the press release? Wasn't that part of the press release, too? That's the fundamental argument before this court, right? Our position is- What was wrong with the caution? Why was that caution insufficient? They're incomplete for a couple of reasons. One, it speaks in conditional language. May impact. May adversely affect. Our allegation is that as of the date that press release was issued, that was insufficient because the conditional warnings they'd given had ceded ground to an actually materialized existing risk of a short squeeze that Credit Suisse knew, with respect to DGAS only, was virtually certain to occur. And it's the combination of four things, two of which were disclosed in the press release and the prospectus, two of which were not, that lead us to that conclusion today. The delisting and the suspension destroyed the market for all of these ETNs. That's a given, right? I mean, once there's nowhere to purchase these things, at least easily, and no new shares are being created, the market no longer works as it's intended to. The problem, though, is what wasn't- And that information was disclosed. The problem was what wasn't disclosed, right? DGAS was unique among all these ETNs that were delisted. There were nine of them. DGAS had an extremely high substantial short interest. Credit Suisse, and we've alleged this based on actual numerical data, had holdings, not inventory, but actual holdings that it knew were required in order for those short interests to actually close out their positions. In other words, the allegation is as of the date of the press release, Credit Suisse knew that once it exited this market, everybody holding a short position would not be able to cover from a mathematical perspective. In other words, what was a functional market and what implicated these warnings about supply, demand, market forces was no longer there. What about the fact that they didn't sell any of the units? This goes, I guess, to Sienta, the district court's alternative conclusion that there was insufficient allegations of Sienta as required for these types of claims. Explain that to me. They were holding, I forget the exact amount, a multi-billion dollars worth of units. And based upon the investor fees we were making, the district court calculated 1.5 million annually. So during that period, $135,000. So what would be the motive if they weren't selling the units? That's a great question, and I think that was one of the areas where the district court misunderstood what we've alleged in our complaints. Our primary, not our only, but our primary Sienta allegation is based on recklessness, right? Which is the knowing disregard of the actually materialized risk of a short squeeze that was going to befall. But the question, I think, is whether, I'm not saying this solves the question. But what did the pretty squeeze have, what did it gain from all the lying that you're saying was going on? That's, I think, something the district court grappled with as well, and I think the response is twofold. One, my reading of the recklessness prong of cases suggests that knowing disregard and misrepresentation of information disseminating incomplete info or half-truths is in and of itself sufficient to prove Sienta under a recklessness prong. Pardon? I'm just saying you're right, the issue is Sienta. Correct, and I think our argument certainly is that the knowing disregard or failure to disclose the specific data points that made the short squeeze imminent is in and of itself sufficient to establish Sienta. I think this was definitely going to happen. I think that, if I go back to your first point, that may, it was just you think was not strong enough, right? That's correct. Weren't the allegations the complaint that the decision to delist an ETN had historically caused the ETN to trade at a discounted price, not an inflated one? So, and also, in this case, the DGAZ maintained a stable trading price for more than one month after it was declined. So how was it inevitable if historically it wasn't inevitable, and in this case, it was a month before it declined? I think those are both actually very good facts for us here with the historical behavior was what investors were to expect. DGAZ was unique. It was different from the other ETNs that had been delisted previously because of this extremely high substantial short interest. I think they will, and there's a possibility that it won't happen. They can get in trouble for that, right? I don't think so. I think our argument is a simple- Will's a pretty strong term. This is definitely going to happen, even though historically it hasn't. Why didn't it happen for a month? Why didn't it immediately happen? Why didn't it immediately happen here? So two things. One, I think that the disclosure we're looking for would have been we've delisted nine ETNs. Note that DGAZ has an extremely high short interest. Once we exit this market and decide to quit participating in it, which we've already made the decision to do, there will not be enough long positions to cover these shorts. Act accordingly. The delay in the short squeeze materializing, I think, is in the complaint, but it wasn't something we focused on in drafting it. It came to fruition later. Once the delisting occurred, it took almost a month for this to pick up on a secondary market. It went from NYSE ARCA, and it eventually, I think it was very late July, maybe early August, picked up on the OTC pink market, which I think is the lowest rated of the OTC market. So there was a natural lag because sellers looking to exploit the short squeeze had nowhere to do it. They had to wait until the OTC popped up. So that explains the timing differential there. So you don't think they intentionally did this just from a financial standpoint? They know, so here, essentially, they were reckless. Didn't you say that a few moments ago? I misunderstand what you were suggesting. When I asked you about they didn't make any money off of this, it doesn't make any sense. You said, well, they were reckless. That's certainly part of it. I think our lead scienter argument is that they were reckless. No, we're not alleging that they had some illicit motive to somehow drain Ms. Gomez of her retirement savings. But what they did have a motive to do, and what we have alleged, is that this was the easy way out. Every time Credit Suisse winds down one of these ETNs, they make some sort of a misstep that lands them in court. With the set capital case that we decided, they accelerated them. Here, they chose the opposite approach. These notes, if they hadn't been forced to accelerate them by FINRA, would have stayed on the books and matured until 2032. Every single year they're in existence, Credit Suisse would realize investor fees. Here, the $135,000, I think, is kind of a red herring because FINRA forced them to accelerate as of August. But if this had gone the way Credit Suisse intended, they would have sat back, avoided the substantial cash outlay that would have been required for them to accelerate them as of the date of delisting, and instead received fees in the process. I think the way we described it in our brief is it was essentially a zero-risk game they engineered at the expense of their investors. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Herb Washer, and I represent the Defendant Appellees, Credit Suisse AG in this case. I just maybe perhaps it would make sense, I don't want to repeat what's in the briefs, so perhaps I could just address a couple of the points that have been just raised. First, with respect to SIEMTER, I do think, Judge Bianco, it's an important point. If Credit Suisse wanted to continue to earn fees, as plaintiff's counsel has suggested, they didn't have to delist these products at all. On June 22, 2020, Credit Suisse announced that it was basically shutting down not just DGAS but eight other products as well. And there are good reasons for that. The reasons are irrelevant. The point is they wanted to close the products down. They wanted to do it in a very civil way. They didn't want to immediately withdraw these products from the market, accelerate and redeem all of these notes, and basically eliminate all of the supply. If Credit Suisse had decided on June 22 to just accelerate all of these notes, take them all back, well, then the shorts, those who needed to go out and find notes, would have found themselves in a much tougher position. But as it stands, Credit Suisse did not immediately accelerate. And, by the way, they could have just let these notes live on until 2032 when they matured and earned fees for another 12 years. They didn't do that. They weren't in this for the fees. They wanted to shut these products down because they weren't popular, because the hedging was too expensive, whatever the reasons were. The point is they wanted to shut them down, and they wanted to do it in a rational and reasonable way. So given the way Credit Suisse did it, it was actually 18 days between the time of the announcement on June 22 and the time that these notes were delisted from the New York Stock Exchange on July 10, meaning the plaintiffs or any other shorts who wanted to unwind their short position had 18 days to go and get those notes on the New York Stock Exchange and satisfy their obligations to return the note to the person from whom they borrowed the note. That's it. These plaintiffs, apparently other plaintiffs, chose not to do that. They waited the 18 days. Indeed, they waited at least 43 days. In the complaint, there is no allegation that the market was disrupted or was functioning inappropriately until August 4th. The disclosure was insufficient. I think that's what their argument is, that the reason they didn't take action was because the disclosure was insufficient. What's your response to that? That is premised on the notion that if you have two people with a single-note short position and you only have one note in the market, that it's a game of musical chairs. Only one of those shorts will be able to get the note, close their position. The other short will be left with no chair to sit in. And that's just not true. It's sort of a fundamental way this market operates. A simple example, if you have two short holders, the first short holder can go out and find a note. Let's just say there's only one note out there. That short holder can go find a note. They buy that note. They return the note to the person from whom they had to borrow the note in order to establish the short position, and they're done. That short position is closed. But the note hasn't disappeared. The note is now sitting there with the person who originally lent it to short number one. Short number two now comes to that same person and says, can I buy that same note? And they do that, and they in turn return the note to the person from whom they borrowed it. And in that way, two shorts have closed their position, even though there was only a single note in the market. So on January 22nd, when Credit Suisse made the announcement, according to plaintiffs' allegations, there were 314,000 shorts in the market. So they had lent, sorry, they had sold short 314,000 notes. The supply of notes, the outstanding notes at the time, supposedly was 305,000. So there's a little bit of an imbalance there. But again, that's only a problem if every short wants to redeem all of their short positions at the very same time. What Credit Suisse did was they avoided that. They didn't say we're immediately accelerating these notes. They said you have 18 days, and really after that you can still find these notes elsewhere. And so shorts had plenty of time to find notes, close their position, sit down. And then the next group of shorts could find the notes, close their position, and sit down. At some point, wouldn't that run out? No, those notes, you can do that endlessly. The problem is a timing one. So, again, if 315,000 notes worth of short holders want to all go and satisfy their short positions, close them out, they'd all need to find 315,000 notes at once. But over the course of 43 days, people could do this periodically and, again, recycle those notes in effect. Because every time somebody buys a note to close out their short position, that note still sits in the market and continues to be available for the next short to come and buy it and satisfy their short position. So it's just false to say that there weren't enough notes in the market. I have to confess that if I understood the way these things work, I would be in the Caribbean now with a cigar. But I'm sorry. Go ahead. So I think, you know, again, plaintiff's counsel talked about this as a mathematical issue. It's not at all. And, again, it's, you know, you could have five shorts close out their short position using the same exact note. It just keeps going from one person to the next to the next. It's like a game of musical chairs, but you have 43 days to find a chair. But you're saying nobody is left without a chair. That's correct. And, in fact, at the end, it's correct, Your Honor. And, in fact, at the end of the day, everybody seems to have closed out their short positions, right? The class consists solely of people who were obviously able to find a note and satisfy their short position because the complaint of all of the class members is that when they bought a note from a third party, because plaintiff's alleged credit squeeze wasn't selling them anymore, they paid too high a price. But they were charged too high a price by some third party. So every single class member by the class definition must have found a note held by a third party, must have paid too much, and now they're complaining about the price. They're not saying we couldn't find notes. They're saying we paid too much for the notes when we got them in the marketplace. And that's essentially the problem with the argument. You're suggesting, though, that that's attributable to your client's actions, what they're calling your client's reckless actions. Why should we not entertain that possibility? Yeah. I mean, again, credit squeeze was doing what it was permitted to do. Plaintiff's counsel said credit squeeze made a public announcement, said we are not going to sell these notes anymore. And we are going to take them off of the New York Stock Exchange. The possibility that credit squeeze would do that is fully disclosed in the offering materials. So credit squeeze had every right to do it. They told people they might do it. As Judge Bianco mentioned, you know, they also explained that that could have an impact on pricing, that a premium could develop because credit squeeze makes a decision to pull those notes from the market or stop selling them. Well, your adversary is going to have a chance to get up in a minute, so I want to be sure I understand your position. So is it credit squeeze's position that there's nothing more they could have said that would have resulted in the plaintiff securing a better price from third parties? I think that's right, Your Honor. I think what plaintiffs are complaining about is credit squeeze didn't say, hey, there's going to be a short squeeze. And the fact of the matter is the math is, A, it's not in the complaint. B, it's not correct to say that there weren't enough notes out there to satisfy all the short positions. So a short squeeze was not inevitable. It's like saying the sky is green and I'm going to sue credit squeeze because they didn't tell investors the sky was green. It's just not true. It's hard to believe that the test is whether somehow they could have said something that were at the time which would have prevented this from happening. They could have picked up the phone and told Gomez don't do it. That's not the standard. Yeah, no, and just so you understand the situation, credit squeeze is the issuer of the notes, but they don't market the notes. They don't distribute the notes. They have no contact with investors in the notes. They simply issue the notes. Is this ETN historically different than other ones? He said this was unique. I noted that historically it didn't always cause this particular problem. Is that true? Is there something unique about this one? No, I mean the only thing that plaintiffs allege that is unique is that the short interest in this product was larger than you might see in some other products. And that's true. And, again, you might say that because there was a larger short interest, there was a greater chance of a squeeze instead of a 10% chance in a normal product. Maybe it's a 20% chance. But as we said in our briefs, even news reports and others a year before this happened said, hey, this product is one of those that might be subject to a short squeeze. So the fact that the risk of a short squeeze was higher with respect to DGAS was very well known. Did Freddie's Squeeze have better inside information that was not available to the newspaper? Yeah, that's also incorrect because the way, in other words, short interest is publicly available information. You can just Google DGAS and short interest and you'll find the amount of the short interest on any given day. Now, the data can be a little stale because what happens is large investors in DGAS and other securities, they report their short holdings to FINRA every two weeks. So it is true that the information that somebody would have seen on June 22 might have been a little stale. That new information came out on June 24. But Credit Suisse had no special insight. Rick Goldman or Morgan Stanley or whoever else held shorts, those folks needed to report their data to FINRA. And then FINRA made it available to Credit Suisse and the plaintiffs and the rest of the class. And so Credit Suisse, there's no allegation in the complaint that Credit Suisse would have had special insight into the size of the short interest. All right. Thank you. Okay, Mr. Centner, you have two minutes. Thank you. Lots to address there. I'll start with this. We certainly don't dispute that Credit Suisse had the right to do what they did. I think whether they should have exercised that right is maybe a moral question beyond the scope of this court. But once they made that decision and chose to publicize it, they did indeed have a duty to disclose all material information necessary to make their press release accurate and not misleading under this court's precedent. Or else did they gain something by not disclosing? I think they did. One, you know, we had the – it was reckless, right? I'm not exactly sure what their motive is. I don't think I have to prove that at the MTD stage. My burden is not to prove what is the most likely explanation, simply to allege a plausible one. And I think we've alleged Center plausibility, plausibly. It's a strong inference of Center, right? It is a strong inference. Even though there's no motive, there's a strong inference of Center with no motive? Well, the recklessness, I think, and again, the allegations, we can talk about whether there's a dispute as to whether we're right factually or not. The allegations in the complaint are that it was substantially certain from a mathematical perspective that this was going to occur. That's recklessness. That's Center. In terms of a motive now, the alternative prong, motive and opportunity, like we said before, exiting in this fashion allowed them to hold on to the substantial outlay of cash that would have been required if they accelerated at the time and receive fees potentially until 2032 in the process. So a couple of the things I wanted to address here. The 18 days that investors supposedly had, I think that's a red herring because they didn't know the gravity of the situation. They received a milquetoast warning that some sort of market imbalance may occur. They weren't given the full panoply of information, meaning that from a mathematical perspective that market was no longer functional. It was no longer existent. There were not sufficient long positions to cover their shorts once Credit Suisse exited the market. And that's really the linchpin of our theory here is that Credit Suisse held all these notes. And once it decided to not make them available anymore, you had this game of musical chairs with the ever increasing pricing that we saw, leading to the absurd results we described in our complaint. Right. That's not a functional market. Degas's investors purchased on the assumption of a functional market. Nothing in the press release led them to believe that the market would no longer function, that it was a rigged game, as we've alleged. That's why we're here today. The last point I wanted to make, unless the court has any questions for me, we talked about the uniqueness of Degas, right? And I think co-counsel pointed out, if you look at paragraph 95 of our complaint, we talk about how the pricing disconnect or dislocation that Degas experienced was historic. Never before had a publicly traded ETN reached even a 100% premium, let alone the 200x premium that occurred during this manipulation period that we've described in the complaint. That game of musical chairs took its toll on retail investors' life savings, right? When these people got liquidated on their margin accounts, they lose everything. All right, thank you. Thank you both. That was our decision. Have a good day. Thank you.